Appeal No. 20-1431 Attorney Amundson Good morning, Your Honor. Jessica Ring-Amundson for Appellant NCTA. With the Court's permission, I'd like to reserve three minutes for rebuttal. Yes. Thank you. May I please the Court?  It was passed in 2012. The Cable Act establishes a national framework for cable regulation that defines and limits the role of states and localities. The Cable Act provides the permissible meets and bounds for regulation of both peg channels and build-out requirements. And Congress was unmistakably clear that it intended to preempt any state or local regulation inconsistent with those limits. Maine's Act to ensure non-discriminatory treatment of peg channels ignores those limits and attempts to place pegs on equal footing with broadcast channels under the guise of consumer protection. Maine's Act likewise ignores that build-out requirements cannot be imposed outside of the franchising process with no consideration of whether they're reasonable to meet community needs in light of cost. May I ask a question, please? I understand. I'd like to draw a distinction between the line extension and the three peg requirements, three categories of peg requirements. I understand the parties have stipulated that the peg extension only applies upon the renewal of a franchise or there being a new franchise. Is that correct? That the line extension requirement applies only to renewals. Yes, Your Honor. Okay. Now, as to the three categories of peg requirements, they are not dependent on there being a new franchise agreement. They are intended to be effective immediately. Is that correct? That's correct, Your Honor. Okay. So the district court in its opinion cites to a House report that basically says states are not free to impose new conditions on existing franchise agreements unless there are unless they are consumer regulations. Okay. So the district court said these are all consumer regulations. If they are not consumer regulations, does that mean that while the state might or may not be able to do this prospectively as to new renewal agreements, it cannot do that as to the existing agreements? From looking at the record, it appears to me that none of the existing franchise agreements contain any of these three categories that the state now wishes to impose on local franchisers. Is that correct? That is all correct, Your Honor. Okay. So hypothetically, if we were to decide these were not consumer regulations, then in fact it's preempted without getting into all of these specific categories. It's essentially preempted because it's not prospective in its application. Are we left then with a ripe dispute as to prospective application? The way I read the record, the first renewal that is to come up is in 2022. Is that correct? No, Your Honor, that's not correct. There are franchises that are subject to renewal right now. Right now. Okay. So you would say as to those, there is a ripe controversy which would force us even as to prospective regulation to decide the type of preemption arguments. And I understand those to fall into sort of two categories. I'll get back to that in a minute. And that we must go ahead and resolve that. Yes, I believe so, Your Honor, that because there are renewals pending now and because what Maine has done is attempt to essentially impose the PEG requirements on existing franchises, that we believe that should all be decided now under the proper preemption. Okay, but it strikes me there are different categories of preemption, whether it applies to existing franchises and whether it applies to future franchises. Okay. So, and pardon my simple-minded approach to this, but as to the PEG regulations, I don't want to get into line extension. There seem to be sort of two buckets of arguments about preemption. First is the bucket of arguments that says the state can't, if the local franchisers are preempted from doing certain things, then the state can't. The district court disagreed with that. But let's assume hypothetically that's true. As I understand your argument, you are saying then it becomes a question under the term adequacy. If the local franchisers are being afforded adequate PEG services, then neither the state nor the local franchisers can impose additional requirements both because of specific provision and because of the structure of the act. The district court rejected the notion that adequacy was the proper preemption standard. Then there is the second category of preemption claims that are tied separately as to each of the three to specific federal statutes about allocation of power between the FCC and local regulation whether it be by state or individual franchises. Is this basic structural understanding correct? Your Honor, I think you did sort of separate out the two flavors, but I do want to take your Honor back to where you started, which was the district court's decision that states are not bound by the act's limits on franchising authorities. I think that the preemption standard that's set forth in 556C... Four minutes remaining. ...shows that that can't be the case. That what Congress intended was that no state law that is inconsistent with the federal framework... Okay, but with deference, can't we move beyond that? If we assume that if a local franchiser cannot do something, then the state can't do it either. Just make that operative assumption, okay? So now we're getting into, well, what can the locals do as... Yes, Your Honor, I agree completely with that. The district court read it exactly the opposite and said that the state was not... Even if the franchising authority wasn't allowed to do something, that the state was allowed to do something. Okay, I appreciate that that is a key decision that has to be made, but now can we get to the arguments, the other arguments about preemption? Yes, Your Honor, and so did you want me to address the specific provisions of preemption that each... Well, first, let's talk about adequacy. Okay. The district court rejected that as a standard. She said, gee, I just don't read the statute that way. You say that's an incorrect reading of the statute. So why? Yes, Your Honor. So both Section 531, which sets forth what franchising authorities and by extension states are permitted to do with respect to PEG, and Section 541, which sets forth the adequacy standard that Your Honor was referring to, set the permissible limits of regulation. And so what the FCC has said is that what adequacy means in this context is satisfactory or sufficient. The district court held that Section 531 and Section 541 didn't even apply here. So it said the adequacy standard was completely off the table. It didn't even have to look at 531 and 541. I believe Judge Barron has a question. If you would like adequacy to be a preemptive provision, could you address the words that adequacy is modifying and why those words are implicated by the Maine regulations of the PEG channel? It's financial support, facilities, and capacity. Which is the word that is implicated by the PEG regulations by Maine in your view? Well, Your Honor, what we're saying is that what Maine has done is not permitted at all by the statute. So it doesn't go to capacity, facilities, or support. So it's beyond anything. No, no. That's the 531 argument. And I want to come back to that. If you're saying that the adequacy provision is a specific provision that leads to an inconsistency that results in preemption, we have to look at the text of that adequacy provision. And it says what has to be adequate is the facilities, capacity, or financial support. Which of those words is implicated by the Maine PEG requirements? So, Your Honor, what I'm saying is that the Maine PEG requirements are wholly outside of what can actually be demanded. So it is neither capacity, facilities, or support. Does that mean the adequacy provision is irrelevant to your preemption argument and that your locus of your preemption argument is elsewhere? No, Your Honor. I mean, what we're saying is that the statute limits what franchising authorities and by extension states are permitted to do. It can require in 531 capacity. And then in 531, adequate capacity, facilities, and support. This is beyond any of those. Okay. So you're saying that that's all you can do. And you're saying that provision is 531? Right. Okay. So going to 531, could you explain to me how the PEG requirements implicate a designation of channel capacity or a use of channel capacity? They do not, Your Honor. And that is why we think that they are beyond the authority of the state to impose. Because 531 tells the state what it is allowed to do. And it doesn't allow the state. So, Your Honor, if I can point you to 531. 531A says that they can regulate with respect to designation of channel capacity and use of channel capacity only to the extent provided in this provision. It does not say they can only regulate the designation of channel capacity or the use of channel capacity. Those are very different sentences. You're reading 531 as if it says you can only regulate designation of channel capacity or use of channel capacity. But the text says you can only regulate with respect to the designation or use to the extent that this provides. I don't see why that tells you that that's all you can do. Well, Your Honor, I think if we just step back and see that what Congress was doing here is setting up a federal scheme. And it established on the one hand PEG channels. It has a separate provision, Section 534, about broadcast channels. And the provision about broadcast channels includes some of the things that Maine is looking for here. So, the provision about broadcast channels has an entire section on channel placement. Congress chose not to put that in the PEG section, Section 531. So, when you contrast 531 and 534, there's also in Section 534 a whole section on signal quality. That's not in 531. Is the 534 channel placement provision an limitation on it? It's a requirement about where channels have to be placed, about where broadcast channels have to be placed. I would say that there is a prohibition against the exercise of authority, which is a very different thing to read 531 to prohibit that. And what I'm saying is just reading the text of 531, it's written as you are allowed to do these things only to the extent as set forth below, not as you are only allowed to do these things. Just as a textual matter. Well, Your Honor, with respect, I think that all of the things that Maine is trying to do flow from designating capacity. They're trying to do things on top of what is required under the Act. And if the Court looks to the way this Court applied the 556C preemption provision in Liberty Cable Vision, what the Court did is looked at the fact that Congress was establishing a national framework, a federal framework that delineated the roles of states and localities versus the Fed. One last time. If you don't, and you don't agree with how I'm suggesting 531 is read, that's totally fine and you've laid out really nicely in your brief why I'm wrong to read it that way. Assuming you're wrong and that 531 itself is not textually providing the limitation, I had thought you were making an argument that the adequacy provision independently served as a limitation. And I'm just wondering if that's so, that would make sense to me if the PEG requirements implicated a regulation of facilities, capacity, or financial support. And I'm asking, is there one of those words you think it's implicating? I'm hearing you say no, but that doesn't matter because it's preempted anyway, which is fine. Perfectly coherent argument. I just want to understand what you're saying to us. So, Your Honor, we do argue that the adequacy is a limit on what you are allowed to do. And I think as I said earlier, all of the... No, no, no, no, no, no, no, no, no. You keep evading Judge Barron's questions. Let me try to get you to focus. What about the PEG regulations go to financial support, facilities, or capacity? They flow from the designation of capacity. So once franchises are allowed to require capacity, they're now imposing extra requirements on how that capacity must be provided. It must be provided in certain channel slots, at a certain resolution, and with certain content in the electronic program guide. Okay. Skipping ahead a little. Although, I must say, a logic professor would have fun trying to figure out the decision trees in this case. I view the guide as having a slightly different set of concerns than the first two, which is as I understand, the state is arguing independently, even if it can't regulate the first two sets of PEG concerns. Nonetheless, it can regulate the third because you have not adequately provided information in your guide. Your response was, oh, the guide isn't up to us. The franchisors need to deal with a third party and we're not stopping them from doing that. But what's that strikes me as a bit of a mismatch. Even if you were permitted to make these changes without state regulations, how is it that people find these channels when you move them and you don't provide any specific information about where they can be moved? Could you address that? Yes, your honor. Just to clarify, when they are moved, consumers are notified that they are moved and where they can find them. How? Mailings and notices on their subscriber bills, your honor. Why isn't that in the guide? Many consumers would look to the guide for that information. Well, they can find PEG channels in the guide. They simply cannot find, in most instances, the hyper localized programming and that's because the PEG providers don't actually supply that. But if I could just take the court to the legal issue here, which is that the guides are in the information service and that states and localities are precluded from regulating information services under section 544. Thanks. I'd like to step back at a few points in the argument. You rely on FCC interpretations. You rely on the state can't do this on an FCC interpretation. I thought you were also relying on an FCC interpretation as to the scope of authority as to adequacy. So could you tell us exactly what issues you're relying for FCC interpretation on and what deference you think we owe the FCC interpretations? Sure, your honor. This is not, as you know, an agency deference case, but nonetheless, the agency is the authoritative body in charge with interpreting the provisions of the Cable Act. We think that FCC's interpretation should be given weight. In terms of which FCC interpretations we're relying on, we're looking at the FCC that has interpreted HDTV as an advanced television requirement that would fall within the signal quality prohibition. The main act of the Federal Cable Act is to regulate signal quality. And, of course, the Federal Cable Act says that the state may not do that. So that's one of the provisions. Another provision where we're relying on the FCC is with respect to adequacy, as I said, where they define adequacy as satisfactory or sufficient. And then we're also relying on the, I know your honor wanted to set line extension to the side for now, but we're also relying on the FCC in saying that build-out requirements are subject to the standard under 546, that they must be justified as reasonable to meet community needs in light of cost. And so those are some of the areas where we're relying on the FCC. Okay, so what's the issue on the line extension? Are you saying the state law precludes consideration? Before you go to the line extension, I just want to make sure we've hit all the many provisions, unfortunately, that we have to resolve in this case. On the electronic programming guide, you say it's an information service. And if it is, then you say that is something that the local franchise authority can't do, which would then tee up the question, if we agreed with you, as to whether the state nonetheless could do it. We'd have to tackle that issue. But there's another provision, which is the prohibition against the regulation of cable service content or content of a cable service. That provision, as I understand it, bars the state as much as it does a franchise authority. That's correct, your honor. I understand you to be saying at a minimum, the electronic programming guide is a cable service of which the content is being regulated definitionally because they're telling you what content to show on the guide. Yes, your honor. There's a D.C. Circuit case which talks about programming of a very different kind that is the content of a cable service. Do we have anything that is analogous to this? It is one step removed from the typical type of programming that you'd regulate. Obviously, Congress was interested in making sure these PEG channels were usable. And there is something a little bit askew about the notion that the Congress that was so intent on making sure the PEG channels were usable also wanted to preclude states and localities and make it knowable what was on the PEG channel to the viewer. That is a little bit of a paradox. It's not obvious to me that we should read content of cable service as broadly as you want to, but do you have anything that would help me think through that? Your honor, I can't point the court to a case that says that regulation of content on electronic program guides is content for purposes of the provision in 544. The court is correct, of course, that in the United video, the programming issue was slightly different. I do want to address the premise of your honor's question, which was that Congress wouldn't have wanted cable operators to make these PEG channels non-findable or non-viewable. I wanted to get at a large part of the state's argument is that cable operators are sort of doing something very nefarious and moving channels, etc. What is happening is actually, as we have the affidavit show, is that PEG channels are moved and placed in sort of genre-based groupings. They're with PBS channels. Because we don't have much time, I understand. You said that in the brief, and I know that. The other two issues on the PEG channels that I wanted to work through before we switch over to the line authority. On the signal quality, you referred to it as a provision that dealt with signal quality in totality, but as I read it, it says minimum technical standards regarding signal quality. So there seems to be at least an interpretive question as to whether a requirement that the signal quality that the programming is received in must be transmitted in that same signal quality to the extent that the franchise already has that capacity because it's doing it for other channels. It's not obvious to me that that is implicating the provision that talks about minimal technical standards for signal quality. Could you address that? Sure, Your Honor. So I guess three points in response to that. First, the fact that it says minimum technical standards for signal quality, the Supreme Court was quite clear in the City of New York case that that does not give states and localities the right to regulate sort of on top of those minimum technical standards. With respect to technical standards, but the question here is, is this main requirement that you simply transmit the programming you get from the PEG in the same signal quality you receive it in if you're using that signal quality for broadcast channels, how is that a technical standard of signal quality at all as opposed to just a regulation with respect to signal quality, which is a different phrase than is used in the Cable Act itself? Yes, Your Honor. So I think on its face what the main act refers to is signal quality, and if the court contrasts the provision at 531 with the provision at 534... How is it a technical standard of signal quality? Right. So it is requiring a particular standard format for transmission. And again, I want to point the court to Maine wasn't shy about what it was doing here. It was trying to place PEG channels on an equal footing with broadcast channels. Counsel, you seem to be missing the thrust of the questions. If you're already providing high definition and regular I've forgotten the term for it. And if the PEG channel is providing you with high definition, so you've already worked out signal quality issues. What's wrong with the state saying if it comes to you in high definition, you ought to broadcast it in high definition? If you can do it already because you're doing it for other channels. It's not as if they lack HD quality capacity. Well, Your Honor, on the facts, with respect to PEG, they do in fact lack that because there has to be, because of the transmission from the PEG facilities to the cable provider's head end, it would require actually significant upgrades of equipment in order to carry things in HD. So, Your Honor... Whose equipment? The cable operator's equipment. Judge Barron had a question. Even if it's received in HD by the cable operator, and even if the cable operator otherwise is able to broadcast channels that receive in HD and send it out in HD, in order to send out PEG HD programming, it would require additional expense? Yes, Your Honor, because of the way that it is transmitted from the PEG facility to the cable provider's head end, and that's why we're here, Your Honor, that it actually would be... And that's just evidence in the record of that point? Yes, Your Honor. The affidavits that we submitted in the record below show that it would require significant upgrade of equipment from the PEG facility to the cable operator's head end in order to provide HD. But the broader point is just that what the main act does on its face is regulate signal quality and try to incorporate the provisions from 534 into 531. The last one I wanted to ask you about was I think it's 543.7b or is it 534.7b, the one that's about the whether there's an effective... channel placement. One thing I'm just puzzled by, and I understand your argument otherwise about why you say this implicitly preemption there, but the text of 543.7b, as I read it, I'm sorry, 543.b.7, just says, each cable operator of a cable system shall provide its subscribers, especially available basic tier. And then it says on that basic tier there has to be PEG channel. The DC circuit seems to have read that provision as if when it says each cable operator of a cable system is implicitly talking exclusively not about each cable of an operator of a cable system, but only about those operators of cable systems that are not subject to effective competition. That seems to be a premise of your reading as well. Is that right? I think that's right, Your Honor. I think, yes. I mean, it's undisputed. Textually, I'm not seeing anything in the act that says that in the text would seem to say that the basic tier for each cable operator of a cable system has to include the PEG channel, which seems quite the opposite of how you're thinking about it. But I take it that the DC did read that as if it has this implicit limitation to those cable operators that are not subject to effective competition. But I just don't see anything in the text that is supporting that. Am I missing something? Well, Your Honor, what Congress intended in the act was that once competition took effect, that the whole system set forth in 543. A way to figure out what they intended is just look at what they said. So is there anything that they said that supports this notion of their intention? Well, it's 543 B7, and then it's the provision that says that once cable operators are subject to effective competition, they are no longer required to have basic tier carriage. Where does it say that? That says, Your Honor, at 5... It's 533 A3, I believe, Your Honor. So once the cable operator is subject to... Let me check, Your Honor. Or I can certainly come back on rebuttal and point Your Honor to that provision. But the idea is that... What Congress set forth was that once effective competition took hold, basic tier requirements were no longer in effect. And so what Maine is doing here is it is both requiring carriage on the basic tier, even though it's undisputed. I'm sorry, Your Honor. I guess I see that with respect to rate regulation. I just didn't see the provision in the text that talks about it with respect to what's on the basic tier. The only provision that speaks to that seems to specifically say each cable operator, which would be everybody. And that's why I'm just puzzled. So basic tier carriage is a component of rate regulation. And that's the D.C. Circuit's opinion in Time Warner. So I don't know if the court wanted to turn to... I realize I'm way over time, but if the court wanted to turn to line extension at all or... Line extension if you want, Judge Lynch. One minute. Thank you, Judge Lynch. With respect to the line extension requirement, we simply wanted to reiterate that the reason that it is spatially invalid is because Maine is stepping into the shoes, essentially, of the franchising authority and dictating a substantive franchise provision of 15 homes per mile without... It's undisputed that there are no findings at all that it is, in fact, justified to meet community needs in light of cost. And so, effectively, all of the existing franchises that, as they come up for renewal, will have to be denied unless they include this provision. And so that is why we think this provision is preempted on its face from the 546 renewal standard, because Maine has made no findings that it is justified in light of cost. And the SEC recently reiterated in its third report... Okay. As to that, here are my questions. Suppose we think that the state of Maine is simply not precluded by the Table Act from imposing regulations that require franchisors, the cities and towns, to comply with certain state requirements, so long as the franchisors are not themselves precluded, preempted from doing so. All right. Your argument seems to be that in every single case that will come up in the future under these new line extension provisions, necessarily there will be no consideration of cost versus benefit. Whereas it's very hard for us to see now why that is necessarily the case. And that tends to suggest that there could be as applied challenges in the future as opposed to a facial invalidation right now. Well, Your Honor, what I think Maine is trying to do here is to flip the burden. During the renewal process, it is the local franchising authority's responsibility to show that what they are requiring of the cable operator is justified to meet community needs in light of cost. And so just to play this out, as a renewal comes up, if an NCTA member in Maine says 15 homes per mile is not justified to meet community needs in light of cost, the local franchising authority's answer is tough. That's what state law requires. So what the state law is mandatory. It does not say, for example, that local franchising authorities shall include a 15 homes per mile requirement, so long as they show that it is justified to meet community needs in light of cost. I think if your provision said something like that, we wouldn't be here. Instead, it's a mandatory provision. If that's your argument and it's right, if it were right, wouldn't that independently be a basis for saying that all of the PEG requirements are also preempted? Yes, Your Honor. We did make that argument that they're also independently preempted by the 546 renewal because there's been no finding that they're justified in light of cost. The district court completely sort of ignored all of that because it started from the premise that these were all consumer protection regulations, so it could impose them on existing franchises. A slightly surprising feature of this argument is that all of these cases that I've read, dealing with all these different regulations, like all the D.C. Circuit cases about the basic tier regulation, none of those state requirements seem to have this up-front reasonability constraint imposed on them. And yet under your view, a lot of people have been wasting a lot of time going through these various provisions of the CABLE Act to see if they're preempted. Because if you could have looked at the face of it and seen, well, you didn't have a built-in up-front reasonableness limitation, therefore it's automatically preempted. And since that doesn't seem to be how anybody's been regulating these things or thinking about it, it's just a little surprising that hidden there all along was this prohibition against any up-front regulation by any franchise authority or state that didn't already have in it a requirement for them to show that it would be reasonable in application, rather than the idea that you could impose the regulation and then it would be subject to the reasonability determination of renewal. Well, Your Honor, I think in at least in this case it's undisputed that there's nothing in the record that this is reasonable in light of cost. So I can't speak necessarily to the cases that Your Honor is looking for. Yeah, but there's nothing in the record that it's inherently unreasonable either. Well, but Your Honor, that's precisely sort of why Congress channeled things through the franchising process. Okay. All right. We're going round in circles now. Thank you very much. Thank you, Your Honor. Attorney Ring-Hamilson, you can unmute. Good morning. May I please the Court? Chris Taub for the Appalachians. I'd like to start with some of the questions that Judge Lynch was asking at the very beginning of the argument relating to the District Court's reference to something in one of the Senate reports, or I guess it was the House report, about requiring certain provisions to be reflected in an ellipsis in the District Court's decision. And she actually left out what I think is a pretty important phrase. So what, in fact, the report says and this first phrase is the one that was left out in the District Court's decision. It says, if under HR 4103 or any state law, a requirement imposed upon a cable operator must be reflected in a franchise, the state may exercise its authority over cable either by establishing a state franchising authority or by placing conditions on a local government's grant of a cable franchise. And then there's the language about how it has to be inserted when it comes up for renewal. Mr. Taub, do us a favor. Send us a letter afterwards giving us the precise language you want us to focus on. Okay? Certainly, Your Honor. And just to close the thought, it's our point that the provisions at issue, the PEG provisions, aren't required to be reflected in a franchise. So I just wanted to make that note. I think it might make sense, because these provisions were discussed a lot before, just to kind of dive into Section 531 and I suppose also 541, I think it is. So 531, and I think the appellant's argument has morphed a little bit during this oral argument, but when it came to 531, their brief I think is a little bit misleading in how they characterize 531A. So the way they characterize it, they say a franchising authority may establish in these brackets PEG requirements, and then they have an ellipsis, only to the extent provided in this section. But I think as Judge Barron was pointing out, what it actually says is a franchising authority may establish requirements with respect to the designation or use of channel capacity. I'm sorry? Why are the main PEG requirements in your view not with respect to the designation and use? Yeah, so our point is that the designation is how many PEG channels are you going to require and what are they going to be designated for? Is one going to be designated for governmental use, one for educational use, and then the use of the capacity is sort of the use by a third party. But I think what's really significant You're asking us to say with respect to, you're saying is not related to, right? We're saying with respect to means that it's a requirement that has to do with the designation. Has the FCC said anything about these provisions you're interpreting? I'm not aware of that, Your Honor, but I want to also point the court to 531C, which says a franchising authority may enforce any requirement in any franchise regarding the providing or use of such channel capacity. And such channel capacity is PEG channel capacity. So this is a different phrase. Yes, but the next sentence says such enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator. Are you saying that that is not a the first sentence? Yes, we think that any requirement regarding the providing or use of channel capacity, and then the including is just an identification of a specific area that is going to fall within that. Okay, but any requirement would seem to refer to the franchise agreement itself. And none of these franchise agreements include any of the state of Maine's PEG provisions. So I don't I understood your argument to be, oh, we're authorized under 531C, but I'm doubtful about that. Sorry, just to be clarified, I took your argument to be 531C shows that 531A is not exclusive of the authority. So if there's background state authority, 531C is contemplating its existence. That's correct, Your Honor. Our argument is that, and I think this is where we this is just really like a fundamental difference between us and the appellant, is I think that the appellant's view is whenever we do something that relates to cable television, we have to look for some authority to do that in the cable act. And our point is that that's not true. That the state has retained its inherent police powers, and it can regulate cable television just like any other matter, so long as it's not preempted by the cable act. So that would mean that you have to look at the cable act, and of course, one of the first issues is, is it consumer protection or isn't it, because there's two different preemption provisions. But our view is that we don't need to find some affirmative source in the cable act to show that we have the authority to do this. NICTA has to show that there's something in the cable act that would conflict with what we're doing or that would specifically preempt what we're doing. And the issue of sort of... Excuse me. You know, one of the frustrations in this case is reference to broad policies as opposed to the text of the act. And so I don't think those statements advance the cause very much. They have provided to us a series of different provisions which they say are preemption provisions, starting with the adequacy and then as to each of the three they go into them. So maybe you ought to address that, Pat. Sure. So I think I've already said, so the first provision that they rely on, and they say that this provision preempts all of the PEG provisions is 531A, which talks about how a franchising authority can only establish requirements with respect to the designation or use of channel capacity if it's set forth in that section. As I argued before, our view is that the PEG requirements don't relate to the designation or use of channel capacity. So that section... I can understand designation, but use is a very, very broad term. Well, Your Honor, I think even NICTA agrees that use means third-party use because this issue came up in the oral argument with respect to another section, to Section 531B. And this was a question that the district court judge asked me because she looked at 531B and saw that a franchise authority may require rules and procedures for the use of the channel capacity designated pursuant to the section. And she said it seems to me this is a slam dunk for you because this relates to the use of channel capacity. And to be honest, that question caught me a little bit off guard, but the way I read that provision, it's the use of the channel by the people who are going to be using it. And NICTA's lawyer agreed, at least for purposes of 531B, NICTA's lawyer agreed that use there means use by third parties. So I think it would be unlikely that Congress meant something different when it used use in I'm sorry, but does that advance the cause if it's with respect to use by third parties? Just about every one of these provisions seems to be with respect to use by the subscribers. Well, I think the point is that the district court judge was suggesting that use is very broad. And so use would mean, for example, that something that says you have to show them in HD would be a use of the PEG channel. Obviously that argument would help us, but I think both NICTA and the state agree that use in this context means how are you going to set up the rules? Like how are people going to become eligible to use the PEG channel? What kinds of organizations are going to be allowed to use it? As opposed to where it's located, information about it, et cetera. Could you go to 541 then and add it? If I may, Your Honor, just before I leave 531, I just want to say that the idea that franchise authorities can't do anything more than just say we want three PEG stations, that would mean that a cable operator could say, okay, we're going to give you a postage size stamp television station that is in the 8,000 range and is going to be shown in black and white. It would be ridiculous that Congress thought that franchise authorities can't say something about how these stations are going to be displayed. With respect to 541, Your Honor, which refers to adequate capacity, that one says that franchise authorities can require adequate... Five minutes remaining. ...that the cable operator will provide adequate public educational and governmental access channel capacity, facilities, or financial support. And our view is that the PEG requirements aren't any of those things. So channel capacity is just how many channels are there going to be? Facilities is things like what kind of equipment or broadcast studios are you going to require the cable operator to provide? And financial support is are you going to give some money to the town so they can televise their local... So that's point one. Point two, and I know this issue came up before. I mean, our view is there's a difference between what a franchise authority can do and what a state can do. Congress clearly knew how to distinguish between the federal government franchise authorities and the state when it drafted the Cable Act because you'll see different provisions. Sometimes it'll say neither the state nor franchise authority can do something. Other times it says neither the federal government nor the state nor a franchise authority can do something. So this is sort of a broad point. Yeah, but isn't this where the FCC interprets the statute to say if the locals can't do it, the state can't do it either. The preemption extends that far. And what's wrong with that reading? Well, I mean, first of all, I'm not sure that... I could be wrong, but I'm not aware the FCC has expressly said it that way. Well, that language is certainly in an FCC opinion, but mind you, the opinion dealt with different issues than this. Yeah, and I think the problem with that is, and I don't know how to say it any differently, is that if you just look at the provision that relates to the content or provision of cable services, I think it's 546, that one says the federal government can't do it, the state can't do it, and the franchise authority can't do it. There's some other provisions that talk about the state can't and the franchise authority can't. If Congress had wanted to say that a state can't do something and knew how to do it, and it would have included it whenever it was referring to what a franchise authority can't do. So I just don't think you can come up with... Yeah, but it doesn't make sense that Congress intended for the state, as a matter of state law, to require franchise authorities to do things that Congress preempted. That just doesn't make sense to me. Well, I mean, I think states stand in a different position than most franchise authorities. I mean, admittedly, states themselves can be franchise authorities, but I thought... I suspect that Congress thought it was important to preserve state authority, and that's apparent from the two preemption provisions. And so I think if Congress really wanted to stop a state from doing something, it would have said so. If you do it through the franchise authority, there is a contracting quality to it, whereas if you do it outside the franchise authority, it's a regulatory exercise, which has a different political dynamic, and so you might have thought they were trying to distinguish between the exercise of contracting power and regulatory power. I think that's exactly right, Your Honor. And also, to be fair, I mean, I think a lot of franchise authorities, especially in Maine, I mean, they're very small, very local. I think Congress may not have wanted to have given them as much authority to include provisions, but instead wanted to sort of leave it to sort of a more accountable entity like state government. Could you go through this 541, just like your... It was helpful to me when your opponent went through each of these provisions, as Judge Lynch was having her do. So the next one up is 541. When you just explained why it's... I guess you just finished 541. The next one up is 547. I'm sorry, Your Honor. I didn't mean to interrupt. I was just going to say that the only thing I didn't add about 541, and I won't repeat it because it's in our brief, is that even if 541, the adequacy applies, we don't think that we're going on beyond requiring what is adequate. Now that 531, as I understand it, and 541 are sort of the general claims of preemption that crosscut all three requirements. They've got specific requirements that go to each of the main requirements. So can we just walk through those? Maybe start us with... I don't know. You take your pick as to which one you want to start with. Why don't we start with 544E, which talks about how the FCC is charged with prescribing regulations to establish minimum technical standards relating to cable systems technical operation and signal quality. So point one is that NICTA keeps suggesting that HD and SD are signal quality issues. But there's no support for that in the record, in the statutes, in the FCC regulations. If we disagreed with you on that, and if we thought that it would be a problem if they had required PEG channels to go out under HD, even for cable operators that didn't have any HD channels at all, is there some argument that, nonetheless, this type of regulation does not implicate a technical standard, a minimum technical standard for HD quality when it applies only to those cable operators that do have HD capacity and are putting out programming that they receive in HD signal quality from PEG channels? Yes, because we're not imposing some new technical standard. We're not saying that you have to show all stations in ultra-full... Can you address the record-based point that your opponent made on that exact issue? Because I understood that she was saying that's not true because there is a technical difficulty in receiving the HD signal from... HD signal programming from the PEG operator to the cable operator. Yeah, so this is going to involve me going a little bit outside the record because this is an issue that came up in sort of discussions with NICTA's counsel when we were trying to reach a resolution of an injunction pending appeal. And so I don't think you'll see this in the record, but I don't think, and certainly if my opponent wants to correct me when she gets up again, she can. But the way that the main statute is designed, it's supposed to say you don't have to help these PEG providers produce their programs in HD. It's just if they're putting it out in HD, then you've got to pass it along in HD without degrading it. As it turns out, and I think this is something that maybe we weren't aware of when we initially briefed the case below, I mean when we briefed it in the district court, is that the cable companies have installed the equipment at the PEG studios. And so the feed goes into the equipment in HD at the PEG studio, but then it's the cable operator's equipment, which is located in the studio, that then sends it to the head end, as my opponent explained. So we think this is an issue that may have to get litigated separately, because the issue is if it's your equipment in the studio, and it's coming to that equipment in HD, then our view is you have to send it along in HD. I think maybe the cable operator's argument is no, just because we supply that equipment, and I think they might supply it under the terms of the various franchise agreements, we don't have to upgrade that equipment. But again, our view is it's their equipment that's causing the problem, and so if they have to upgrade their equipment to get it to the studio, then that's their responsibility. I'm both glad I asked you that question. I have a fact question. There are commercial channels and presumably some type of commercial education channels that must transmit in HD. Why did the cable operators not have a problem there, but they have a problem with the PEG channels? That's a great question, and I can tell you what I think the record fairly reflects, which is cable operators by law have to provide PEG stations, but they don't like them, and I think they even acknowledge that in their complaint where they say, we would prefer to provide other content, because they don't make direct money off the PEG stations. So they have to carry them in name only, and so what they've done is they've done everything possible to minimize them, to make them so no one wants to watch them, and so eventually maybe they won't have to carry them anymore. So they refuse to show them in HD, even though over 300 other channels that they have are all in HD. Their argument is they don't have the bandwidth, doesn't pass the straight face test. They move them to this range of stations which no one ever goes to, and they actually claim this was done to help people find the stations, that it's much easier to find them when they're moved to these places, and then they don't provide any information. Next provision is the question about the channel placement, and that implicates the effective competition provisions in 543.7B, if I've got it right. Yeah, and your Honor, as you were asking your questions and I was looking at it, I realized that perhaps we should have made a different argument on that one, or an additional argument. Certainly at least one federal court has interpreted that as saying that only cable systems that are subject to effective competition are subject to this tier provision, but I do see the argument that there's nothing in the statute that actually says that. It says all cable systems have to provide PEG on the basic tier, and so I think one way of looking at the statute is to say what Congress was doing is it was sort of starting out with this is what the basic tier is going to be for everyone, and then this is how we're going to regulate the I'll be up front and honest. We did not make that argument in our brief. We just sort of assumed that what the federal court said in the other case was accurate, but I completely agree, your Honor, that there is a real question there about whether or not this requirement applies to all cable operators. Okay, then the last issue is the electronic programming guide, and Judge Lynch or Judge Burroughs may want to ask about the information services part of it, and I understand there's a part of it that's covered, but can you explain to me why it's not the regulation of the content of a cable service? I'm having trouble seeing how it isn't. Yeah, so I mean, I have a couple responses to that. I mean, I think the first is the intent was that of 544F1 was to make sure that neither the states nor the federal government nor franchise authorities were dictating what kind of programs or channels were going to be offered or not offered. How would you read the text to draw the following distinction? Presumably, you cannot, as a franchise authority or as a state, mandate that on the electronic programming guide, you set forth elaborate reviews of how good the programs are, because that would be the regulation of the content of a cable service, even though it's a channel guide. So that being the case, how am I supposed to read the word content that would nonetheless allow the regulation of this particular type of content? So I think one way you could do that, Your Honor, would be to say that, and I think there's sort of two issues, because there's first the issue of at least just putting the name of the PEG station on the guide, right, because right now they just say local and that's it. So I think at the very least, I don't see how anyone could say that just saying Portland WCBT 6. I don't think that's content. I mean, that's just an index entry in a database, essentially. So I think that's clearly not content. And then, you know, also saying just what the name of the show is that's playing a particular time, we would say that's not anything content either. Again, that's just one step down from an index of what's on. I mean, certainly we can't tell them that when you're showing a football game, you have to describe what happened the last time the teams met or who the main players are or anything like that, but certainly just giving the basic information. I mean, this is like, you know, people can't find stations without the program guide. I mean, this would be like a library deciding that they don't want people looking at a particular category of books, and so just taking those books out of the card catalog and just having people have to hunt through the shelves to look for the books. One last turn on this is just if the card catalog is the equivalent of the cable service, then saying what is on the cards in the catalog is the regulation of the content of the card catalog. So regulation saying what the electronic programming guide says would be regulation of the content of the cable service. That's the difficulty I'm having textually. So I don't know if this is what you're saying or not, Karen, but I would say that the books in the library are the content, and the card catalog is just a way of finding them. So I would say the card catalog itself is not the content, but the other point I want to make is that when it comes to PEG stations, states and franchise authorities can regulate the content of those. I mean, that's one of the exceptions to content regulation. So if states can regulate and franchise authorities can regulate what's on the PEG stations, it would seem ridiculous that we can't also regulate that there would be an entry in the program guide saying what's being shown. Mr. Todd, you're not going to be surprised by this next question, which I'm also going to ask your opponent. Is there any point in asking the FCC its views on at least some of these preemption issues? Have you all tried? No, Your Honor. We've taken, and I'll be honest, I don't do a lot of this kind of regulatory table type work. I don't know how the FCC operates in practice. We haven't talked about it before. It's something we'd be willing to think about for sure. Well, it's not unheard of for this court to ask a government agency to file an amicus brief setting forth its views. We've done that more than a few times. Yeah. I mean, certainly that's the court's prerogative. I've been involved in cases where the court has asked for the federal agency to weigh in. Again, though, I think here there's just really no reason for the FCC to weigh in. I think this is straight statutory interpretation. I think, yes, the FCC does bring some expertise to bear, but I think in these issues, I really think that the court can interpret the statutes just as well as the FCC can. Well, gosh, that's sort of being complimented with the left hand, but thank you. All right. We'll hear from your opponent. I'm sorry, Judge Lynch. You asked about the line authority and the effect of the unreasonableness standard, and I just wanted to hear, Mr. Todd, your response to that. I know there's a particular issue of the line authority, but I really think it's a global claim about how to understand the act, which is that all regulations by franchise authorities or states imposing them must come in the form of a regulation that does not impose unreasonable costs, otherwise they'd be preempted. If you could just respond to that. Just to set it up and make it a little sharper on your side, I suppose the force of that argument relates to the burden shifting point, and there is a certain oddity that if we know that the renewal cannot be denied, if you can show that the regulation that you're not complying with was imposing unreasonable costs, what is the sense in allowing regulations that up front don't even attempt to assess whether they would be imposing reasonable costs or not? I will answer that question. I just want to say at first that when it comes to line extension, we actually think and we said this in our brief, that franchise authorities are entitled to do universal line access if they want to. I think that the case and the FCC rules that NICDA is citing, they're dealing with a different provision which talks about giving a franchise to a second entrant into the market. I just want to put that out there. To answer your question, Your Honor, I think the first point is that this line extension requirement inherently has a reasonable requirement built into it because it talks about the build out in terms of homes per mile, 50 homes per mile. So that means that a very rural franchise area may not impose any kind of line extension because it doesn't meet that limit whereas a more dense area, that is going to apply there. So it sort of by definition is going to be tailored to how many customers are you going to end up being able to bring online if you extend one more mile of the cable service. But I think, and this goes to sort of the burden of proof, which is that NICDA agrees that franchise authorities can put line extension requirements in their franchise agreements and they agree that states can mandate that they put certain line extension requirements in their franchise agreements but they seem to say that the state can't impose just a one size fits all requirement that it has to somehow be tailored. Well again, we think ours is tailored because we're not saying, you know, we're tailoring it based on how many people are going to end up being served. But the other point is that I think if their argument was going to prevail, they'd have to show that this is unreasonable in at least some context. I mean, as the district court said, she kind of flipped it and said they have to show that it would never be a reasonable requirement. But if they're going to say that our line build out is improper, they should have to at least offer some evidence that in some circumstance it's not going to be a reasonable build out requirement and they've offered zero evidence on that. And then just the final point is, if it turns out that there is some area where 15 homes per mile for some reason is unreasonable, there's a process for that as the district court set out, which is to do an as applied appeal in that situation. Thank you. Attorney Taub, if you could mute your device at this time, and Attorney Ring-Amundson, please proceed. Thank you. I'd like to just start quickly with where Mr. Taub left off, which was the line extension requirement and his contention that there's no evidence that it's unreasonable. In fact, all of Comcast's franchises in Maine and the vast majority of Charter's franchises in Maine currently include line extension requirements that are not nearly as onerous as the 15 homes per mile extension requirements. So there's evidence in the record that the vast majority of franchises in Maine would be subject to denial at renewal because they contain non-conforming line extension policies. And then just to turn to Peg quickly, we spent a fair amount of time talking about 531 and 541, and I just want to return to the district court's opinion, which found those provisions wholly inapplicable to the state of Maine. In fact, the court said that the state could regulate completely outside of those provisions because it was acting as a state and not as a franchising authority. And that sort of interpretation of the Cable Act would threaten the entire foundations of the act. And just to look at how the court applied the existing preemption provision in the Liberty Cablevision case, that was a provision that applied only to franchising authorities. And the court didn't say, well, although the franchising authority is limited to a 5% franchising fee, this provision doesn't say anything about what municipalities can do, so municipalities are free to impose a fee on top of that. That's essentially what the state is arguing that it is allowed to do here. You're not making the argument, just so I'm clear, because sometimes it sounds like maybe you are making this argument. You're not making the argument that states are prohibited from doing things that franchises authorities are allowed to do. No, Your Honor, we're not making that argument. We're not taking issue with the fact that a state has a choice. It can act either as a franchising authority or it can impose conditions on a franchising authority, but it has to always act consistent with the act. The second thing is just on your preemption argument that arises from the reasonableness language in the renewal. If you're right, then how will the renewal provision ever come into play? Because the restriction to not be preempted would itself have to satisfy the renewal standard. If there was any gap between the two, you would say the restriction up front was already preempted. That doesn't make any sense. Your Honor, what we're saying is simply that when a franchising authority imposes a requirement on a cable operator, it has to be cost justified in light of community needs. The preemption argument is sort of a separate standard. It has to satisfy the standard set forth in the renewal provision. Yes, Your Honor, but something can still be inconsistent. Then the renewal provision becomes irrelevant because anything that wouldn't satisfy it was already preempted when they first enacted it. That can't make sense unless I'm missing something. I'm afraid I'm not following Your Honor's question. You're saying that if the line extension, that the renewal provision is sort of an independent preemption authority. I don't think that's what we're arguing, Your Honor. We're simply saying that what the main statute has done here is to impose a one size fits all. Ms. Amundson, your brother says no. There's a clear distinction based on the 15 persons per mile. The more rural areas will not meet that. The more urban areas would. There is no evidence in this record that as to that 15 number, that it is inherently cost ineffective as opposed to community benefit. In the absence of such evidence, you cannot mount a facial attack. What's the response to that? Your Honor, our evidence is, as we stated, that every one of Comcast's franchise in Maine and the vast majority of Charter's franchises in Maine currently include line extension policies that are less onerous than 15 homes per mile. Every one of those would have to be denied when they come up for renewal based on the state's provision with no finding about whether a 15 homes per mile requirement is justified in light of community needs. You could have some as applied challenges at that point. Yes, Your Honor, but we think that's not what the provision intends. The burden is on the franchising authority to show that that's what the provision contemplates is that the franchising authority must show that if it's imposing a requirement on cable operators, that requirement is justified by community needs in light of cost. Here, the district court flipped the burden and said that in every instance it's going to be the cable operator who has to fight that battle. Okay. Anything else? The only other thing I just wanted to point to, Your Honor, is that Judge Barron, with respect, you asked about the interpretation of 531A, and I would just point you to the 1984 House report that we cite throughout our brief at page 45 where it does say that franchising authorities are limited to regulating PEG only as required in 531A. We think that the district court erred in finding 531 and 541 just wholly inapplicable to these provisions and then imposing them as consumer protection requirements on existing franchises. I just have one last question on that point. If that would make sense if use was broad, is that right or not? I'm sorry, I didn't hear that. Is that because you would read use broadly to encompass these type of PEG requirements? It could, Your Honor, yes. Then wouldn't that mean that all the PEG requirements are rules and procedures regarding use, and therefore they'd all be authorized by 531 itself? That seems the problem that you've got. I don't see how use can both help you in creating preemption, but then it becomes narrow with respect to authorization for rules and procedures. That doesn't make sense to me. I just want to be clear that the state has not, and neither the state nor the district court ever attempted to justify these under 531A or 531B. The state did attempt to justify these under 531C, which we think is a provision about enforcement, not a grant of authority. So 531A and 531B don't provide authority for the state's enactment here. One more question. Mr. Taub, when he was questioned about whether the guide is content or not, putting aside the index versus content, he says it doesn't matter because the content prohibition does not apply to PEG. Well, Your Honor, we do think that it is both the provision or content of cable service. So it's regulating both the provision and content of cable service. And I just do want to point out that Mr. Taub seemed to say, well, look, would it be so bad to just make them put the station name there? But that's not what the Act requires. What the Act requires is that they be displayed in ways exactly the same as broadcast stations. As we put in the record, that actually requires a lot of expense because of the hyper-localized nature of PEG. So you would have to have different programming guides in every different franchising authority, as opposed to most of the other parts of the guide, which are statewide or at least regional in nature. So that's not what the guide requires. And more importantly, that's not what the provision requires. More importantly, that's not what Congress required. So we don't have to guess at what Congress intended. When you compare 531 and 534, 531, the provision regulating PEG, and 534, the provision regulating broadcast channels, what Maine is trying to do here is to import protections that are given to broadcast channels into 531 for PEG, and we don't think that's allowed. If the court has no further questions, we would ask the court to reverse the district court. Any further questions? Thank you. Thank you both. Thank you. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this Honorable Court. Counsel, you may disconnect from the meeting.